IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ZUP, LLC,                                     )
                                              )
             Plaintiff,                          )
                                              )
v.                                            )     Civil Action No. 3:16-CV-125–HEH
                                              )
NASH MANUFACTURING, INC.,                     )
                                              )
             Defendant.                          )

## MEMORANDUM OPINION
### (Granting Defendant's Motion for Summary Judgment)

Plaintiff ZUP, LLC ("ZUP" or "Plaintiff") brings suit against Defendant Nash

Manufacturing, Inc. ("Nash" or "Defendant") after a proposed business deal for a joint

manufacturing venture turned sour.  Both ZUP and Nash manufacture water recreational

devices, with the former being a relative newcomer to the industry and the latter having

worked in the area for over fifty years.

ZUP entered the market in 2012 with the introduction of its "ZUP Board,"

patented as U.S. Patent No. 8,292,681 (the "'681 Patent").  A year later, ZUP and Nash

began discussions about a potential partnership, which eventually dissipated.  Soon

thereafter, Nash brought its "Versa Board" to market.

In response to Nash's new product, ZUP filed the present suit alleging four counts:

contributory infringement of the '681 Patent (Count I); inducement of infringement of the

'681 Patent (Count II); trade secret misappropriation (Count III); and breach of contract

(Count IV).  Nash brought two counterclaims against ZUP, seeking declaratory relief

regarding non-infringement (Counterclaim I) and declaratory relief regarding invalidity of the apparatus and method claims—Claims 1 and 9 respectively—of the '681 Patent (Counterclaim II).

This matter is currently before the Court on Nash's Motion for Summary Judgment, filed on September 14, 2016. (ECF No. 35.) Both parties filed memoranda supporting their respective positions. Oral argument followed on November 16, 2016.

For the reasons discussed herein, the Court will grant the Motion as to Defendant's Counterclaim II—rendering Counts I and II of Plaintiff's Complaint and Defendant's Counterclaim I moot—and as to Counts III and IV of Plaintiff's Complaint. Consequently, this case will be dismissed with prejudice.

## I.    BACKGROUND

As required, the Court resolves all genuine disputes of material fact in favor of the non-moving party and disregards those factual assertions that are immaterial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Applying this standard, the Court concludes that the following narrative represents the facts for purposes of resolving the Motion for Summary Judgment.

In or around 2008, Glen Duff, ZUP's Chief Innovative Officer, and his wife bought a boat and joined a local water skiing club. (Compl. ¶ 12; ECF No. 1.) Through their volunteer activities with their church, the Duffs took groups of kids on their boat to teach them how to water ski and wakeboard. (*Id.* ¶ 13.) During these outings, Glen Duff noticed how difficult it was for many of the children to fully engage the water recreational devices. (*Id.*) As a result, he decided to develop a new product that would

2

"allow any kind of rider, regardless of athleticism or amount of upper body strength, to get up and achieve a full standing and riding position." (*Id.*) Over the next four years, Duff and others tested various board designs until they developed a working prototype of the ZUP Board. (*Id.* ¶ 15.) This new board allows riders "to transfer easily from a prone position, to a kneeling position, to a full upright standing position," thereby permitting "the widest spectrum of riders the most opportunity of experience." (*Id.* ¶¶ 14, 16.)

The ZUP Board has a top surface and a bottom surface, two side-by-side foot bindings located on the middle section of the board, two side-by-side handles on the front section of the board, and a retractable tow hook attached to the front section of the board. *See generally* U.S. Patent No. 8,292,681. Riders are instructed to grasp the handles and lie flat on the board in a prone position. The retractable tow hook is attached to a tow rope, which is in turn pulled by a boat. As the boat picks up speed, riders pull themselves up on the board and assume a kneeling position. Then riders crouch on the board, still grasping the handles for stability, and eventually place both feet in the side-by-side foot bindings displaced on the middle section of the board. Riders finally release their grip from the handles and then grasp the tow rope bar and disengage it from the retractable tow hook on the board as they assume a full upright standing position.

While developing a working prototype of the new device, Duff arduously fought to secure a patent for his new design, which he finally obtained on October 23, 2012. *Id.* The '681 Patent includes twelve (12) total Claims, with Claim 1 covering the apparatus and Claim 9 covering the method for using the ZUP Board. *Id.* at Claims 1, 9.

In September 2012, one month prior to the issuance of the '681 Patent, ZUP

formally introduced its new product at the Surf Expo, a trade show for the water sports industry. (Compl. ¶ 17.)  At some point during the spring of 2013, Nash became aware that ZUP had entered the industry and saw the ZUP Board for the first time.  (App. 255 ¶ 4.)[1]

Nash has been in the water recreational device industry for over fifty years and "has designed and manufactured . . . water skis, knee boards, wake boards and other similar devices, and has sold these products to a variety of sporting goods retailers, including Bass Pro Shop, Academy Sporting Goods, Dick's Sporting Goods, Big Five Sporting Goods and others." (Mem. in Supp. of Mot. for Summ. J. 2.)  Nash's president, Keith Parten, is the named inventor for several patents, including an aquatic recreational system with a retractable tow hook (U.S. Patent No. 7,530,872 B2), a retractable tow hook (U.S. Patent No. 7,537,502), a water recreation board with a pass-through tow rope (U.S. Patent No. 6,042,439), a towing harness for water recreational boards (U.S. Patent No. 6,306,000), a design of a wake ski (U.S. Design Patent No. D557,635), a design of a towed inflatable device (U.S. Design Patent No. D650,462), and a method for manufacturing a skate board (U.S. Patent No. 921,513).

An initial round of conversations between the two parties concerning a potential manufacturing deal took place in the fall of 2013. (*See* App. 271.)  Before engaging in serious discussions, it appears that ZUP requested that the parties enter into a confidentiality agreement. (*See id.*)  Parten questioned the necessity of such a contract on

---

[1] Nash attached a 567-page appendix to its Memorandum in Support of its Motion for Summary Judgment.  ZUP also attached a supplemental appendix to its Response, where it continued the numbering from Nash's appendix.  The Court will consider both appendices as one document and will cite to the appendix generally.

September 18, 2013, noting that "[w]e just need a sample so we can quote you a price to build your item. I assume we could just order one . . . ." (*Id.* (ellipses in original).) Without signing the agreement, Nash obtained a sample of the board. (*See id.* at 272.) On December 10, 2013, Parten determined that Nash would "[n]ever do this item" and sent the board back to ZUP. (*Id.*)

Nevertheless, a little more than one month later, Parten reached out to Duff on January 31, 2014, "to talk . . . regarding production and distribution of [the] ZUP board." (*Id.* at 451.) Before meeting with Nash to discuss the possibility of entering into a manufacturing and distribution partnership or potential sale of the company, ZUP again required Nash to execute a confidentiality agreement, which it did on February 5, 2014. (*Id.* at 273–75.) After the agreement was signed, ZUP asserts that it provided Nash "with confidential and proprietary information, including, but not limited to, information regarding: (a) ZUP's vendors; (b) component costs and materials; (c) patent information; (d) marketing plans and strategies; (e) retailer arrangements and contacts; (f) new design concepts and materials; (g) ZUP's intellectual property development and enforcement strategies; and (h) ZUP's proprietary roto-molded 3D computer designed model." (Compl. ¶ 57.)

On February 5, 2014, the same day that the parties entered into the confidentiality agreement, representatives from ZUP and Nash held a telephone conference about the proposed deal. (*See generally* App. 568–72.) During the meeting, Parten allegedly told ZUP's representatives that they "had a great product" and noted that Nash "ha[d] no intentions in the next few years of doing anything that has any resemblance to the ZUP

Board." (*Id.* at 568, 572.) Also during that conversation, Nash inquired about the issuance of the '681 Patent. (*Id.* at 572 ("Will your patent hold up against [another competitor's] new product[?]").)

Two days later, on February 7, 2014, Parten sent Duff an email with several questions regarding three Claims in the '681 Patent.[2] (*Id.* at 462.) In response, ZUP spoke with its patent attorney and forwarded the responses to Nash. (*Id.* at 461.) The scope of the patent attorney's advice was explaining the difference between independent and dependent patent claims. (*See id.*)

At the same time that he posed these questions to Duff, Parten asked Nash's patent attorney, Eric Karich, to look at the '681 Patent, specifically asking "[h]ow can this be issued?" (*Id.* at 306.) Karich responded, "It is supposedly an improvement over other such boards, the claims are quite narrow." (*Id.*) Parten and the attorney later spoke by phone, and Parten asked whether Nash's proposed Versa Board would infringe the '681 Patent. (*Id.* at 259 ¶ 11.) Karich told Parten that Nash's new product would not infringe, and later memorialized that opinion in writing on October 6, 2014. (*Id.* at 307–13.)

In the meantime, discussions between Nash and ZUP ended without reaching an agreement. (*See id.* at 464–86.) And in May 2014, Nash brought its new product, the Versa Board, to market. (*Id.* 256 ¶ 8.)

Like the ZUP Board, the Versa Board has a top surface and a bottom surface, with a retractable tow hook disposed on the front section of the board. On the top surface of

---

[2] Significantly, none of the questions concerned either Claim 1 or Claim 9, which are at issue in this case. (*See* App. 462.)

the board, there are several holes configured in different patterns. Users are instructed to attach handles or foot bindings in these holes in one of four configurations. In the first configuration, users can choose not to attach either the handles or the foot bindings to the board and use it for "wakeskating" or surfing. (Mem. in Supp. of Mot. for Summ. J. 30.) In the second, users can choose to attach only the foot bindings to the board in a side-by-side, horizontal configuration, allowing the user to water ski. (*Id.*) In the third configuration, users can choose to attach only the foot bindings to the board in a vertical configuration so they can wakeboard. (*Id.* at 29.) And in the fourth instructed configuration, users can choose to attach only the handles to the Versa Board so they can use it for kneeboarding. (*Id.* at 31.)

Nash instructs its customers to only use the product in these four ways and specifically warns against leaving the handles attached while standing up on the board. (Mem. in Supp. of Mot. for Summ. J. 33–34; *see also* App. 387–88.) Nevertheless, it is feasible for a user to ignore those instructions and attach both the handles and the foot bindings in a configuration that is nearly identical to the ZUP Board.

In September 2014, Nash unveiled its Versa Board at the 2014 Surf Expo. (Compl. ¶ 23.) During the event, Duff approached Parten and expressed his concern that Nash's product infringed on the '681 Patent. (Duff. Decl. ¶ 7.) In response, Parten allegedly told him to "get over it" and said that patents are meaningless in the water recreation industry. (*Id.*) Nevertheless, Duff reached out to Parten one more time in an attempt to secure a manufacturing or distribution deal and to avoid litigation. (App. 487, 489.) This last-ditch effort bore no fruit.

As a result, ZUP brought suit on March 1, 2016, and Nash filed its Answer and Counterclaims on May 5, 2016. Upon reviewing the Complaint and counterclaims, the Court finds that it has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

After extensive discovery, Nash filed the present Motion for Summary Judgment on September 14, 2016. (ECF No. 35.)

## II.   LEGAL STANDARD

The analytical framework for reviewing motions for summary judgment is well settled in both the Fourth and Federal Circuits.[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *See id.* at 255; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

The party seeking summary judgment has the initial burden of showing an absence of a material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To

---

[3] The Federal Circuit applies its own law with respect to issues of substantive patent law and procedural issues pertaining to patent law. "For issues not unique to patent law, [the Federal Circuit] appl[ies] the law of the regional circuit in which [the case] would otherwise lie." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010).

defeat summary judgment, the nonmoving party must go beyond the mere pleadings and provide affidavits, depositions, interrogatories, or other evidence to demonstrate that there is in fact a genuine issue for trial. *Id.* at 324. If a party who bears the burden of proof at trial fails to come forward with sufficient evidence to establish the existence of an element essential to that party's case, summary judgment should ordinarily be granted. *Anderson*, 477 U.S. at 248.

This methodology is applied in a similar fashion to patent infringement cases. To prevail, the party claiming infringement must establish that the accused product meets every limitation recited in the accused claim, either literally or under the doctrine of equivalents. *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005); *Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358, 359 (Fed. Cir. 1996).

Challenges to the validity of a patent, however, face a higher burden of proof. Noting nearly a century of seamless jurisprudence, the United States Supreme Court stated in *Microsoft v. i4i Limited Partnership* that "there is a presumption of [patent] validity [that is] not to be overthrown except by clear and cogent evidence." 564 U.S. 91, 101 (2011) (citations omitted). In order to prove invalidity, the movant "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

## III.  DISCUSSION

### A. Claims 1 and 9 of the '681 Patent Are Invalid Due to Obviousness

Congress has stated that "[an issued] patent shall be presumed valid." 35 U.S.C. §

9

282(a).[4]  Pursuant to this direction, Congress has also provided that "[e]ach claim of a

patent (whether in independent, dependent, or multiple dependent form) shall be

presumed valid independently of the validity of other claims." *Id.*

In challenging the validity of Claims 1 and 9 of the '681 Patent—both of which

are independent claims—Nash cites Section 103 of the Patent Act, which forbids the

issuance of a patent where "the differences between the claimed invention and the prior

art are such that the claimed invention as a whole would have been obvious before the

effective filing date of the claimed invention to a person having ordinary skill in the art to

which the claimed invention pertains." 35 U.S.C. §103(a).

The Supreme Court clarified the analysis trial courts are to use when assessing a

Section 103 claim of obviousness in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).

In that case, the Supreme Court held that "[t]he ultimate judgment of obviousness is a

legal determination," *id.* at 427, to be assessed based on several underlying factual

findings, including: (1) "the level of ordinary skill in the pertinent art" at the time of the

invention; (2) "the scope and content of the prior art"; (3) the "differences between the

prior art and the claims at issue"; and (4) objective evidence of nonobviousness such as

commercial success, long felt but unsolved needs, evidence of acclaim from the

inventor's peers, and the failure of others to innovate. *Id.* at 406 (quoting *Graham v.*

---

[4] ZUP argues that the "factual determination [that Claim 1 was patentable over the prior art] made by the examiner is entitled to deference." (Resp. to Mot. for Summ. J. 21.) While this is true, the Federal Circuit has held that such deference "takes the form of the presumption of validity under 35 U.S.C. § 282." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Therefore, while the existence of uncited prior art does not weaken the presumption, it does "make[] it easier for the party challenging the validity of the patent to carry its burden of proof. *Alco Std. Corp. v. Tennessee Valley Auth.*, 808 F.2d 1490, 1497 (Fed. Cir. 1986).

*John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)); *see also Eli Lilly & Co.*, 619 F.3d at 1336; *Rolls-Royce, PLC v. United Technologies Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010).

This Court has previously held that "[t]he determinative question" in assessing a claim of obviousness "is whether 'one of ordinary skill in the art would have been motivated to use the teachings of a prior art process, in its normal disclosed operation, to create a product that [he] claims in a subsequent patent." *Rutherford Controls Int'l Corp. v. Alarm Controls Corp.*, Civ. Action No. 3:08CV369-HEH, 2009 WL 3423849, at *8 (E.D. Va. Oct. 23, 2009) (alteration in original) (quoting *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359 (Fed. Cir. 2001)). "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *KSR*, 550 U.S. at 420.

Therefore, the Court will assess the four *KSR* factors in determining whether Claims 1 and 9 of the '681 Patent are invalid due to obviousness.[5]

### i. The level of ordinary skill in the pertinent art

Nash has proposed that one of ordinary skill in the art 2008 was "a person with at least 3-5 years' experience in the design and manufacture of water recreational devices or ha[s] a bachelor's degree in mechanical engineering." (App. 259 ¶12; App. 518.) ZUP does not dispute this definition. (Resp. to Mot. for Summ. J. 14.)

---

[5] The Federal Circuit has affirmed trial courts' usage of the *KSR* factors when invalidating patents due to obviousness on summary judgment on multiple occasions. *See, e.g., Ohio Willow Co. v. Alps South, LLC*, 735 F.3d 1333 (Fed. Cir. 2013); *Odom v. Microsoft Corp.*, 429 F. App'x 967 (Fed. Cir. 2011).

Because the parties are in agreement, the Court will treat this factual finding as undisputed.

### ii.    The scope and content of the prior art

Before discussing the scope and content of the prior art, the Court finds it necessary to provide some context by detailing the Claims that Nash is challenging on obviousness grounds.

Claim 1 of the '681 Patent—the apparatus claim—teaches a water recreation device comprising:

a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;

a tow hook disposed on the front section of the riding board;

first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook;

first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles; and

a plurality of rails protruding from the bottom surface of the riding board and extending substantially the full length of the riding board:

wherein the tow hook includes a rearward-facing concave section sized to receive a tow rope bar and positioned to allow the riding board to be pulled in a forward direction by a tow rope attached to the tow rope bar,

wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing in a forward direction,

wherein the plurality of rails are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from a reference location substantially central to the front section, and each of the plurality of rails is laterally spaced closer to the longitudinal axis nearest the rear section of the riding board than the

[*sic*] each of the plurality of rails is laterally spaced from the longitudinal axis nearest the front section of the riding board thereby allowing the water that moves across the bottom surface nearest the front section of the riding board to funnel towards the bottom surface nearest the rear section of the riding board for the purpose of generating lift force against the bottom surface of the riding board.

Claim 9 of the '681 Patent—the method claim—teaches a method of riding the

apparatus described in Claim 1 by:

placing a water recreation device into a body of water, the water recreation device comprising:

a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;

a tow hook disposed on the front section of the riding board;

first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook; and

first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles;

attaching a tow rope to said tow hook, said tow rope also attached to a water vehicle;

grasping the first and second handles of the water recreation device to establish a prone start position by a rider;

maintaining said prone start position by the rider until the riding board has achieved a substantially parallel position relative to the surface of the water;

achieving a kneeling position by the rider by placing both knees on the top surface of the riding board;

achieving a crouching position by the rider by placing a first foot into the first foot binding and then placing a second foot into the second foot binding;

grasping the tow rope by the rider by releasing the first and second handles;

removing the tow rope from the tow hook by the rider;

standing on the riding board by the rider while continuing to grasp the tow rope.

Having set out the specific Claims, the Court will now shift its focus to the scope and content of the prior art at the time the '681 Patent issued.

"'Prior art' in the obviousness context includes the material identified in [35 U.S.C.] section 102(a)." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006) (citing *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003)). Section 102(a) defines prior art as inventions that were "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention," which in this case was December 2, 2008.[6] 35 U.S.C. § 102(a)(1). "Art that is not accessible to the public is generally not recognized as prior art." *Ormco*, 463 F.3d at 1305 (citing *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997)).

The parties have identified eleven examples of prior art for the Court to examine. The Court will address each in chronological order.

### a. Atlantic Aquatic Stunt Team Board (1938–47) ("Atlantic Aquatic Reference")

Nash alleges that ZUP neglected its duty to disclose a photograph of the Atlantic Aquatic Reference—a device apparently in use between 1938 and 1947—with its patent

---

[6] ZUP initially filed its application for a patent of the ZUP Board on December 2, 2009 (App. 27), though it claimed the benefit of earlier priority based upon the filing of a provisional application one year earlier, on December 2, 2008. *See* Application No. 61/200,637 (filed on Dec. 2, 2008).

application, pursuant to 37 C.F.R. §1.56. (*See* Mem. in Supp. of Mot. for Summ. J. 20 n. 3, 20–21.) The picture of the Atlantic Aquatic Reference attached to Nash's Memorandum in Support of its Motion for Summary Judgment shows a water recreation device with side-by-side handles and side-by-side foot locators, both on the top side of the board. (*Id.* 21.)

The only evidence that Nash provided regarding the source of the photograph was an email attaching the image with the subject line reading "Photo from Nov. 6, 2013." (App. 314.) Nash did not clarify how it obtained the image at oral argument. Instead, it merely noted that it found the photograph on the internet.

As an initial matter, even if the Atlantic Aquatic Reference is admissible—which is a point of contention between the parties—the Court has serious doubts as to whether it qualifies as prior art. Nash has provided no evidence that the Atlantic Aquatic Reference was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public" prior to December 2, 2008. 35 U.S.C. § 102(a). Moreover, since Nash was unable to provide a specific source for the picture, the Court is wary that the reference may "not [be] accessible to the public." *Ormco*, 463 F.3d at 1305.

Therefore, the Court will not address the Atlantic Aquatic Reference in its analysis.

### b.  Schmitt, U.S. Patent 3,918,114 ("Schmitt Patent")

The Schmitt Patent, issued on November 11, 1975, teaches a water ski with "a plurality of grooves which extend inwardly from each end a portion of the length of the ski." U.S. Patent No. 3,918,114, abstract (filed May 24, 1974). The skis have a top

surface and a bottom surface.

According to Figures 1 and 2, the grooves along the bottom surface of the skis are disposed relative to a longitudinal axis projecting rearwardly from a reference location substantially central to the front section. *Id.* at figs. 1, 2. In those Figures, the rails are spaced closely together at the longitudinal axis nearest the rear section of the riding board and fan out to the sides of the board as they move towards the front section. *Id.*

In the preferred embodiment of the board, the rails converge, unlike the rails taught in the '681 Patent. *See id.* However, the Schmitt Patent teaches that the front of the skis will be out of the water when in use, thereby leading the submerged rails to converge towards the rear of the board, like those on the ZUP Board. *Id.* at col. 1, ll. 53–65.

### c. Monreal, U.S. Patent No. 4,678,444 ("Monreal Patent")

The Monreal Patent, issued on July 7, 1987, teaches a "Water Gliding Scooter Board" that is "intended to accommodate a rider gliding over water while towed from a speed boat by a tow-rope." U.S. Patent No. 4,678,444, abstract (filed Feb. 24, 1986). The patent depicts a board with a top surface and a bottom surface.

The device includes "a hard plastic hood" on the top surface of the board, which allows for improved versatility of use by permitting riders to engage in a low kneeling, high kneeling, or high sitting position. *Id.* at col. 1, ll. 39–43.

Two tow hooks—each of which can be engaged depending on the direction in which the user is riding the board—are disposed on the front section of the board. *Id.* at figs. 1–3, col. 3, ll. 11–22. The tow hooks include a rearward-facing concave section

16

sized to receive a tow rope. *Id.* at figs. 1–3. Additionally, the board has two sets of side-by-side foot bindings, disposed on the top surface of the board in the front and middle sections. *Id.*

### d. Clark, U.S. Patent No. 5,163,860 ("Clark Patent")

The Clark Patent, issued on November 17, 1992, teaches a tow system for a water board. U.S. Patent No. 5,163,860, abstract (filed Aug. 27, 1991). The patent depicts a riding board with a top and bottom surface. The bottom surface "may be provided with conventional strakes or grooves to facilitate planing on the water or directional stability." *Id.* at col. 2, ll. 25–27. The top surface of the board has a recess for holding a tow rope handle as the board is being towed. *Id.* at col. 3, ll. 1–10.

According to the patent, the addition of this recessed tow hook allows a user to "lie prone on the board and grip the board with both hands as the towing operation begins. As the towing speed increases, the user may either remain prone, pull himself into a kneeling position, or rise to a standing position without worrying about holding the tow rope." *Id.* at col. 1, ll. 41–46. Additionally, there is a leash on the board that is attached to a bracket, which the user can grasp while kneeling or sitting on the board to aid in stability while riding on the water. *Id.* at col. 2, ll. 30–34.

This invention was motivated by a desire to assist users of all skill levels in achieving a riding position on kneeboards. *See id.* at col. 1, ll. 32–40.

### e. Echols, U.S. Patent No. 5,083,955 ("Echols Patent")

U.S. Patent No. 5,083,955, entitled "Aquatic Recreational Towing Devices," issued on January 28, 1992. U.S. Patent No. 5,083,955 (filed Oct. 11, 1989). The

Echols Patent teaches a water recreation device with a top surface and a bottom surface. The board has a tow hook on its front section that engages a removable handle, which is connected to the tow rope. *Id.* at col. 5, ll. 35–57. The tow hook includes a rearward facing concave section sized to receive the tow rope. *See id.* at figs. 8–10.

Figure 1 shows foot bindings, although they are not configured in a side-by-side manner. *See id.* at fig. 1. And while the patent does not suggest the use of side-by-side handles like the '681 Patent, the rider is instructed to hold on to the board or the handle attached to the board—which in several embodiments is separate from the tow hook handle—with one or both hands "to stabilize himself" before fully engaging the tow hook handle to assume a standing or kneeling position. *Id.* at figs. 2, 3, 7–9, 12, col. 2, ll. 33–34, col. 4, ll. 21–22.

Referencing the same feelings of exclusion cited by Duff in the creation of the '681 Patent, Echols noted that he was motivated by a desire "to make it easier for a rider to initiate the towing and positioning of [kneeboards and ski boards] preparatory to riding and maneuvering them." *Id.* at col. 1, ll. 13–15, 28–38.

### f. Stewart, U.S. Patent No. 5,797,779 ("Stewart Patent")

The Stewart Patent, issued on August 25, 1998, teaches a bodyboard with "a differentiated topskin" to aid in rider maneuverability and stability. U.S. Patent No. 5,797,779 (filed Feb. 8, 1996). The board has a top surface and a bottom surface.

Noting that "the rider's grip is extremely important to maintaining bodyboard control," *id.* at col. 1, ll. 38–39, the patent teaches the use of a "palm grip which provides a rider handhold" and a "palm well" to aid in "gripping the side edge of the bodyboard

18

core." *Id.* at col. 2, ll. 56–57, 62–63. The palm grips are "positioned adjacent in a forward corner of the board" and, in the preferred embodiment, "are raised and are given enhanced surface friction characteristics." *Id.* at col. 6, ll. 9, 11–12. The palm wells are located "just behind the palm grips," *id.* at col. 6, ll. 15, in order to provide the rider something to grasp on to for aided stability.

Though the "palm grip" and the "palm well" do not amount to side-by-side handles, like those found in the '681 Patent, the Court finds that they are functionally equivalent.

### g. Hornsby, et al., U.S. Patent 5,820,430 ("Hornsby Patent")

The Hornsby Patent, issued on October 13, 1998, teaches an aquatic recreational device with a bifurcated hull to be used as a kneeboard by a pair of side-by-side riders. U.S. Patent No. 5,820,430, abstract (filed Oct. 10, 1997). The board has a top surface and a bottom surface.

According to figures 3, 4, and 6, there are a plurality of rails—channels and skegs—which are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from a reference location substantially central to the front section. *See id.* at figs. 3, 4, 6. These rails were an improvement over the then-existing prior art because they provided additional stability for riders as they attempt to engage the board. *See id.* at col. 1, ll. 35–37.

### h. Fleischman, U.S. Patent No. 5,979,351 ("Fleischman Patent")

U.S. Patent No. 5,979,351, entitled "Towable Recreational Water Sled," issued on November 9, 1999. U.S. Patent No. 5,979,351 (filed May 2, 1998). The patent teaches a

"towable, flexible, unsinkable water sled for accommodating single or multiple riders." *Id.* at abstract.

The patent depicts a water recreation device comprising a flexible board having a top surface and a bottom surface. The image attached shows multiple handles secured to the front of the board "that allow the riders to hang on while being towed." *Id.* at col. 2, ll. 45–46; *see id.* at fig. 1. A review of the patent demonstrates that these handles are used for engaging the apparatus rather than to aid in rider stability, like those in the '681 patent.

Though used for different purposes, the Fleishmann Patent shows that the use of side-by-side handles attached to the front of a water recreational device was present in the prior art at the time the '681 Patent was issued.

### i. Parten, *et al.*, U.S. Patent No. 6,306,000 ("Parten '000 Patent")

U.S. Patent No. 6,306,000, entitled "Towing Harness for Water Recreation Boards," issued on October 23, 2001. U.S. Patent No. 6,306,000 (filed Feb. 29, 2000). Invented by Keith Parten and assigned to Nash, the Parten '000 Patent teaches an "improved towing harness for use in combination with a water recreation device." *Id.* at abstract.

The patent depicts a water recreation device comprising a riding board with a top surface and a bottom surface. The claimed invention is a tow rope that is connected to the boat and passes through an eyelet in the front section of the board, which is then attached to a handle that users can either engage or leave stationary on the board. Several images depicting the patent's use contemplate riders in a variety of positions, such as

20

lying down, sitting, kneeling, or standing on the board. *See id.* at figs. 4–11. The patent

clearly anticipates riders moving between these positions while the board is in use. *See*

*id.* at col. 2, ll. 53–54 ("The rider may change positions while riding the board."), col. 6,

ll. 18–44 (describing all of the positions in Claim 1 of the patent).

According to the Parten '000 Patent, the tow-rope configuration was already being

utilized in a commercial product called the Ski Skimmer at the time of issuance. *Id.* at

col. 5, ll. 33–34. The image of the Ski Skimmer attached to the patent shows a board

with first and second side-by-side foot bindings disposed on the middle section of the top

surface of the board, similar to those taught in the '681 Patent. *Id.* at fig. 14.

### j.   Fryar, U.S. Patent No. 6,585,549 ("Fryar Patent")

U.S. Patent No. 6,585,549, entitled "Momentum Induced Wakeboard Stabilization

System," issued on July 1, 2003.  U.S. Patent No. 6,585,549 (filed Apr. 2, 2002).  The

patent teaches a water recreation device comprising a riding board having a top surface

and a bottom surface.

Along the bottom surface are a plurality of rails (vanes) that are disposed relative

to the longitudinal axis of the board, projecting rearwardly from a reference location

substantially central to the front section. *Id.* at fig. 1. These rails extend substantially the

full length of the board. *See id.* Each of the plurality of rails is placed closer to the

longitudinal axis near the rear side of the board than those placed near the front side of

the board, allowing the water that moves across the bottom surface to funnel towards the

rear section of the board for the purpose of generating lift force. *See id.* at fig. 7A; *see*

*also id.* at col. 4, ll. 2–9 ("Figure 7A shows the flow of water over the generally planar

21

bottom surface in line with the longitudinal axis of the wakeboard.  As the diagram shows, the water flowing over the interior van surfaces of the vanes is channeled towards the longitudinal axis of the wakeboard.").  According to Nash's expert, Dr. Charles A. Garris, Jr., "[i]t is well known in the art that the flow of fluid on the bottom of the wakeboard has momentum that gives rise to lift forces according to Newton's Law of motion."  (App. 523.)

The patent's inventor, Jared Fryar, claims that using this channeling system on a wakeboard "enhances the rider's control and hold while increasing the speed of the wakeboard around [a] turn."  '549 Patent, col. 2, ll. 5–9.

### k.  Parten, U.S. Patent No. 7,530,872 ("Parten '872 Patent")

The final piece of prior art offered by the parties, the Parten '872 Patent, teaches an aquatic recreational device "configured for towing with a towline" and a method for riding it.  U.S. Patent No. 7,530,872, abstract (filed Feb. 23, 2005).  The patent issued on May 12, 2009.  Also invented by Keith Parten, the patent depicts a kneeboard with a top surface and a bottom surface.  It has a retractable tow hook disposed on the front section of the board.  The tow hook includes a rearward-facing concave section to receive the tow rope bar and is positioned to allow the board to be pulled in a forward direction by the tow rope attached to the tow rope bar.  *Id.* at figs. 2–4.

The apparatus contains straps on the board's midsection, preferably placed over the rider's thighs to secure the user to the board.  *Id.* at fig. 6.  Next to the straps are side-by-side recesses for the user's knees.  *Id.*

Like the ZUP Board, the Parten '872 Patent was specifically invented to "aid[]

22

young, weak, or inexperienced riders in achieving proper riding body positioning on an aquatic recreational device." *Id.* at col. 2, ll. 49–51. The primary means of aiding those riders was to use and incorporate a retractable tow hook within an aquatic recreational device. *Id.* at col. 3, ll. 53–58.

Through its expert, Dr. Charles A. Garris, Jr., Nash asserts that the straps on the midsection of the board have the same function as the side-by-side handles on the ZUP board: to increase rider stability. (App. 520–21.) This position is a bit tenuous since it appears that the straps' primary purpose is to secure the rider to the board rather than to aid in stability. *See* '872 Patent, col. 5, ll. 18–19, 24–32.[7] However, Parten expressly contemplated using a "type of rigid bar, semi-rigid bar, or other suitable device" instead of straps to aid in stability. *Id.* at col. 5, l. 39. Therefore, the Court will treat the concept of using a rigid bar to aid in rider stability, like the side-by-side handles taught in the '681 Patent, as one contemplated by the prior art.

### iii.    The differences between the prior art and the claims at issue

To aid in its analysis of Claims 1 and 9 in view of the prior art, the Court will first recount the '681 Patent prosecution. The Court will then analyze the Claims at issue, whether they are obvious in light of the prior art, and whether someone of ordinary skill would have been motivated to combine the prior art references to create the apparatus and method described in the '681 Patent.

---

[7] "Kneeboard preferably comprises two straps adapted for releasable-interconnection with each other through the use of hook-and-loop type fastening materials. More specifically, the hook-type material is preferably permanently affixed to one strap and the loop type material is preferably permanently affixed to the other strap; however, straps may be releasably joined through the use of buckles, knots, or other suitable devices or means of releasably connecting the two straps." '872 Patent, col. 5 l. 24–32

23

### a. Patent Prosecution

When initially filed, Claims 1 and 9 (formerly Claim 15) were much broader than those that were issued in the final '681 Patent. And so, during the initial patent prosecution, the examiner rejected all of the claims in the application. (App. 108.) Relevant to the present matter is the examiner's determination that Claim 1was anticipated by the Echols Patent and the Clark Patent, was obvious over the Monreal Patent in view of the Clark Patent, and was obvious over the Hornsby Patent in view of the Echols Patent. (*Id.* at 109–13.)

Additionally, the examiner initially rejected Claim 9 (formerly Claim 15) after finding that it was anticipated by the Clark Patent. (*Id.* at 109–10 ("Clark teaches the claimed method of riding a water recreation device, including the grasping of a handle (a handle is anything designed to be grabbed by hand, and in this instance, such does not define over the rail of the board), the removing of the tow rope from the deck attached hook, and the subsequent standing of the operator.").)

As a result, Duff amended Claim 1 by arguing that the rails on the ZUP Board are intended to provide lift as opposed to stability, like the ones contained in the Hornsby Patent. (*Id.* at 127.) Duff also amended Claim 9 (formerly Claim 15) to include side-by-side foot bindings, distinguishing them from the ones contained in the Monreal Patent. (*Id.* at 132.)

Upon receiving the amendments, the USPTO issued a final action, again rejecting all of the claims in the application. (*Id.* at 151.) The patent examiner noted that Duff's argument regarding the rails' intended use in comparison to the Hornsby Patent was

insufficient as "[t]he claimed lift is a characteristic of all rails and fins." (*Id.* at 153.) The examiner determined that Claim 1 was unpatenable as obvious over the Echols Patent in view of the Fryar Patent. (*Id.* at 153–54 ("Echols discloses the claimed invention with exception of the claimed protruding rails. . . . Fryar provides protruding rails on a bottom of a water recreation device.").) He also rejected Claim 1 as obvious over the Hornsby Patent in view of the Schmitt Patent and the Echols Patent. (*Id.* at 155–56 ("Hornsby . . . discloses the claimed invention with exception of a hook and handles and converging rails. . . . Schmitt teaches the angling of such rails such that they converge as they progress aft, thereby producing lift. . . . Echols . . . shows . . . a hook for engaging a tow line with a handle lying on the deck, or as noted above . . . a hook and a handle on the deck.").) Finally, the examiner rejected Claim 1 as being obvious over the Monreal Patent in view of the Fryar Patent and the Clark Patent. (*Id.* at 156–57 ("Monreal shows the claimed invention with exception of a handle and protruding rails. Clark . . . shows a handle." And Fryar provides protruding rails on the bottom of a water recreation device.).)

The patent examiner similarly rejected Claim 9 (formerly Claim 15) as being obvious over the Clark Patent in view of the Echols Patent and the Stewart Patent. (*Id.* at 158 ("Clark discloses the claimed method of riding with exception of using foot bindings and the grasping handles. . . . Echols teaches a board generally as that of Clark, with the provision of foot bindings. . . . Stewart teaches provision of handles in/on the top surface of a riding board.").)

Subsequent to the USPTO's final rejection of the patent application, Duff, through

his attorneys, reached out to the patent examiner for an informal telephone interview, which was held on June 7, 2012. (*Id.* at 163.) After the interview, the examiner issued a summary of their discussion where he noted that Duff's inclusion of "side by side foot bindings and handles configured for simultaneous engagement as now proposed . . . would appear to define over the rejection." (*Id.* at 167; *see also id.* at 177–78.)

Duff submitted a final round of amendments, which resulted in the issuance of the '681 Patent. (*Id.* at 246.) Duff then assigned the patent to ZUP. (*Id.* at 250.)

Significantly, throughout the entire patent prosecution, there is no evidence that the examiner referenced or contemplated the Fleischman Patent, the Parten '000 Patent, or the Parten '872 Patent.

### b. The prior art as it relates to Claims 1 and 9 of the '681 Patent

The central elements of Claims 1 and 9 of the '681 Patent are: (1) a riding board with a top and bottom surface; (2) a tow hook dispensed on the front section of the board; (3) a plurality of rails protruding from the bottom surface of the riding board; (4) side-by-side handles disposed on the front section of the board; (5) side-by-side foot bindings disposed on the middle section of the board; and (6) the simultaneous use of the handles and foot bindings to achieve a standing position on the board.

Within the context of examining the prior art as it relates to Claims 1 and 9 of the '681 Patent, the Court notes that the Federal Circuit has held that "[a] claim can be obvious even where all of the claimed features are not found in specific prior art references, where 'there is a showing of a suggestion or motivation to modify the teachings of [the prior art] to the claimed invention.'" *Ormco*, 463 F.3d at 1307 (second

alteration in original) (quoting *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225

F.3d 1349, 1356 (Fed. Cir. 2000)).

> Additionally, the Supreme Court has stated that

> [w]hen there is a design need or market pressure to solve a problem and
> there are a finite number of identified, predictable solutions, a person of
> ordinary skill has good reason to pursue the known options within his or
> her technical grasp. If this leads to the anticipated success, it is likely the
> product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 421. In simpler parlance, "[t]he combination of familiar elements

according to known methods is likely to be obvious when it does no more than yield

predictable results." *Id.* at 416. [8]

Through this lens, the Court finds by clear and convincing evidence that Claim 1

of the '681 Patent would have been obvious to an ordinary person skilled in the art over

the Clark Patent in view of the Parten '000 Patent, the Parten '872 Patent, the Fleischman

Patent, the Stewart Patent, and the Fryar Patent.

The Clark Patent teaches all of the components of the apparatus Claim absent side-

by-side foot bindings, and a plurality of rails protruding from the bottom surface of the

riding board. The Clark Patent discloses a board with a top surface and a bottom surface,

a recessed tow hook, and a handle—as the patent examiner noted, "a handle is anything

designed to be grabbed by hand." (App. 109–10.) The Parten '000 Patent discloses side-

---

[8] *But see KSR*, 550 U.S. at 418–19 ("[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

by-side foot bindings disposed in the middle section of the top surface of the board, similar to the ones described in Claim 1.  The Parten'872 Patent teaches a retractable tow hook displaced on the front section of the board that is nearly identical to the one used on the ZUP Board.  The Fleischmann Patent teaches the use of side-by-side handles disposed on the front section of a water recreation device, and the Stewart Patent shows the use of side-by-side "grips", the functional equivalent of handles, on the front section of a board to aid in rider stability.  Finally, the Fryar Patent discloses a plurality of rails protruding from the bottom of the board that are disposed relative to the longitudinal axis, like those on the ZUP Board.

The Court further finds by clear and convincing evidence that Claim 9 of the '681 Patent would have been obvious to an ordinary person skilled in the art over the Clark Patent in view of the Parten '000 Patent, the Stewart Patent, and the Monreal Patent.

The Clark Patent discloses the claimed method of engaging a water recreation device with the exception of using side-by-side foot bindings.  It teaches users to lie prone on the board, to grip the board with both hands—which is the functional equivalent of side-by-side handles—before assuming a kneeling position, and ultimately to rise to a standing position.  The Parten '000 Patent teaches the use of side-by-side foot bindings and expressly anticipates riders moving between a prone, a kneeling, and a standing position while using the product.  Moreover, as discussed above, the Stewart Patent shows the use of side-by-side "grips", the functional equivalent of handles, on the front section of a board to aid in rider stability, like those used on the ZUP Board.  And the Monreal Patent discloses similar foot bindings, permitting riders to engage in multiple

28

riding positions while on the water.

It is evident to the Court that Duff identified known elements in the prior art that aided in rider stability while engaging a water recreational device and simply combined them in one apparatus and method. The elements in Claim 1 and 9 are used for the exact same purpose as they were in the prior art and, as expected, lead to the anticipated success of assisting riders in reaching a standing position.

Additionally, the Court finds that one of ordinary skill in the art would have been motivated in 2008 to combine these elements in order to aid in rider stability, to allow a wide variety of users to enjoy the device, and to aid users in maneuvering between positions on a water board. These motivations are a driving force throughout the prior art and have been shared by many inventors in the water recreational device industry. *See, e.g.*, Clark Patent, col. 1, ll. 32–40; Echols Patent, col. 1, ll. 13–15, 28–38; Hornsby Patent, col. 1, ll. 35–37; Parten '872 Patent, col. 2, ll. 49–51. And the specific desire to aid users in maneuvering between positions on a water board has been a consistent motivation in the prior art for decades. *See, e.g.*, Clark Patent, col. 1, ll. 41–46 ; Monreal Patent, col. 1, ll. 39–43; Parten '000 Patent, col. 2, ll.53–54, col. 6, ll. 18–44.

Consequently, the Court finds that there is a strong *prima facie* case that Claims 1 and 9 of the '681 Patent are invalid due to obviousness in view of the above. Still, the Court will assess the three secondary considerations proffered by ZUP to ensure against hindsight bias in reaching this conclusion.

### iv. Secondary considerations

Trial courts are required to consider objective evidence of non-obviousness in

every case in order to preclude hindsight bias. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("Indeed, we have repeatedly stressed that objective considerations of non-obviousness must be considered in *every case*."). Nevertheless, strong evidence of obviousness cannot be overcome by the mere "presence of certain secondary considerations of nonobviousness." *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006). Moreover, "a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009).

The Federal Circuit has held that secondary considerations are inadequate to establish non-obviousness where the "claimed invention represents no more than the predictable use of prior art elements according to established functions." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). And, even if secondary considerations exist, the patentee is still required to establish a *prima facie* case that a nexus exists between the novel aspects of the claimed invention and the evidence of secondary considerations in order for that evidence to be given substantial weight. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310–11 (Fed Cir. 2010); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

ZUP offers three considerations for the Court to consider: (1) that the ZUP Board satisfied a long-felt but unresolved need in the water recreation industry; (2) that Nash copied the ZUP Board; and (3) that the ZUP Board has experienced commercial success.

30

The Court will address all three considerations.

### a) The ZUP Board has not satisfied a long-felt but unresolved need in the water recreation industry

ZUP, through its expert, James Emmons—who owns a 2% equity interest in the company (Emmons Decl. ¶ 2)—asserts that "[t]he water-recreation industry had failed over a 50-year period to innovate beyond providing riders stability within various pre-determined positions of tubing, kneeboarding, skiing, or wakeboarding." (Resp. to Mot. for Summ. J. 22 (citing Emmons Decl. ¶¶ 13–16).) ZUP alleges that this unresolved need is evidenced by Nash's "enthusiastic acceptance" of the ZUP Board's "simultaneous engagement of components so riders could more easily get up out of the water." (*Id.* (citing *WBIP*, 829 F.3d at 1332–33 (holding that an acknowledgement by defendant that "The need is clear!" is sufficient to establish evidence of a long felt but unresolved need in an industry)).)

ZUP's assertion of Nash's "enthusiastic acceptance" is wholly derived from two statements allegedly attributable to Keith Parten: (1) "You have a great product by the way!" (App. 568); and (2) "Think you are spot on with Wally Weekender. Same guy that rides a kneeboard and tube. Want to be able to do it the first time every time." (*Id.*)

The Court finds this argument to be entirely devoid of merit. These statements are nothing more than passing compliments at the outset of a business relationship and can hardly be construed to have the same effect as the acknowledgement made by the defendant in *WBIP*, 829 F.3d at 1332–33 ("The *need* is clear!" (emphasis added)). As such, the Court finds that ZUP has provided no evidence apart from conclusory

statements made by its expert that any long-felt but unresolved need existed in the industry.

Further, "where the differences between the prior art and the claimed invention are as minimal as they are here . . . it cannot be said that any long-felt need was unsolved." *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).

Additionally, even if the differences between the prior art and the claimed invention were substantial, the Court would find that ZUP has failed to provide any evidence that others in the industry attempted and failed to make a board with stabilizing features, such as handles, foot bindings, and rails. (App. 519–32 (collecting prior art).) Absent such a showing, "the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

Consequently, the Court finds that ZUP has failed to establish either that a long-felt but unresolved need existed in the water recreational device industry or that its product somehow solved any such need. As such, this consideration does not aid ZUP in overcoming a finding of obviousness.

### b) There is no evidence that Nash copied the ZUP Board

The Federal Circuit observed in *WBIP* that "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336.

ZUP asserts that Nash copied its product because the Versa Board "has a tow hook at the front section, side-by-side handles at the front section, and side-by-side foot

bindings at the middle section." (Resp. to Mot. for Summ. J. 23.) But even a cursory review of this claim reveals that, while the Versa Board possesses each of these components, there is no evidence that Nash advertises, instructs, or even encourages its customers to use them at the same time. (*See* App. 266, 379–380, 387–88, 428–42.) Absent such evidence, the Court is hard pressed to reach the conclusion that Nash copied either the apparatus or method claim of the '681 Patent.

Moreover, ZUP has provided no evidence that Nash attempted to independently create the device described in the '681 Patent and failed. *See Vandenburg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) ("The copying of an invention may constitute evidence that the invention is not an obvious one. This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed." (citations omitted)). This deficiency lends even more weight to a finding that Nash did not copy the ZUP Board.

As a result, the Court finds that this consideration does nothing to tip the scales towards a finding of non-obviousness.

### c) ZUP's evidence of the '681 Patent's commercial success is insufficient

Finally, ZUP argues that the commercial success of the ZUP and Versa Boards supports a finding of non-obviousness. (Resp. to Mot. for Summ. J. 24; *see WBIP*, 829 F.3d at 1337 ("Demonstrating that an invention has commercial value, that it is commercially successful, weighs in favor of its non-obviousness.").) In support of this consideration, ZUP has provided documents showing its total sales since 2012,

amounting to $1,562,426.74.[9]  (Wawrzyn Decl. ¶ 3.)

This evidence, alone, is insufficient for the Court to make a determination that ZUP has experienced commercial success.  As the Federal Circuit has noted, "evidence related solely to the number of units sold provides a very weak showing of commercial success, if any." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) ("[T]he number of units sold without evidence of the market share is only weak evidence of commercial success."). ZUP has failed to provide sufficient evidence of its market share or how other water recreational devices—apart from the Versa Board—performed in the market during the same time period.

Further, ZUP has failed to make a showing of a nexus between its alleged commercial success and the supposedly novel features contained in the '681 Patent. *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016) ("[T]he patentee must establish a nexus between the evidence of commercial success and the patented invention.")

Therefore, the Court has no choice but to reach the conclusion that ZUP's evidence of commercial success is insufficient to overcome a finding of obviousness.

## v.  Conclusion

In view of the above, the Court finds that it would have been obvious for one of ordinary skill in the art to combine the references in the prior art in order to invent both

---

[9] ZUP also includes Nash's sales of the Versa Board, totaling $792,361.00 since 2014.  (Wawrzyn Decl. ¶ 4.)  Since the Court has determined that the Versa Board does not infringe the '681 Patent—either contributorily or by inducement—this figure is irrelevant to the present analysis. *See infra* Part III. B.

the apparatus and method Claims in the '681 Patent. And this finding is not overcome by

ZUP's evidence of nonobviousness. Consequently, the Court finds by clear and

convincing evidence that Claims 1 and 9 of the '681 Patent are invalid pursuant to 35

U.S.C. §103(a).

Therefore, the Court will grant Defendant's Motion for Summary Judgment as it

pertains to Defendant's Counterclaim II, which renders Counts I and II of Plaintiff's

Complaint and Defendant's Counterclaim I moot.

## B. Alternatively, Nash Has Not Contributorily Infringed Claim 9 of the '681 Patent Nor Has It Induced Others to Do So

Assuming *arguendo* that Claim 9 of the '681 Patent was valid, the Court would

still grant Nash's Motion for Summary Judgment as it pertains to ZUP's claims of

contributory infringement (Count I) and inducement of infringement (Count II).

### i. Nash did not contributorily infringe the '681 Patent

Congress defined liability for contributory patent infringement in 35 U.S.C. §

271(c):

> Whoever offers to sell or sells within the United States . . . a component of
> a patented machine, manufacture, combination or composition, or a
> material or an apparatus for use in practicing a patented process,
> constituting a material part of the invention, knowing the same to be
> especially made or especially adapted for use in an infringement of such
> patent, and not a staple article or commodity of commerce suitable for
> substantial noninfringing use, shall be liable as a contributory infringer.

The Federal Circuit has held that "there can be no . . . contributory infringement

without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear

Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted); *see also Dynacore*

*Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect

infringement, whether inducement to infringe or contributory infringement, can only arise

in the presence of direct infringement, though the direct infringer is typically someone

other than the defendant accused of indirect infringement."); *Joy Techs., Inc. v. Flakt,*

*Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of

infringement or for contributory infringement is dependent upon the existence of direct

infringement.").

In this case, ZUP has provided no evidence of direct infringement. Instead, ZUP

relies solely on a Nash customer survey where two customers admitted to "leav[ing] the

handles on the Versa board while using the side-by-side foot bindings" to substantiate its

assertions that there was direct infringement of Claim 9 of the '681 Patent.[10] (Resp. to

Mot. for Summ. J. 15; *see also* App. 389–404 (containing the results of the online

customer survey).)

Of course, the fact that two customers left the components on the Versa Board

necessary to potentially infringe the apparatus claim of the '681 Patent does not mean

ipso facto that they infringed the method claim as well. *See, e.g., Ormco*, 463 F.3d at

1311 ("Method claims are only infringed when the claimed process is performed, not by

the sale of an apparatus that is capable of infringing use."); *Joy Techs., Inc. v. Flakt, Inc.*,

6 F.3d 770, 773 (Fed. Cir. 1993) (holding that "[t]he sale of [an apparatus capable of

---

[10] In the same breath, however, ZUP argues that the "survey evidence is entitled to little weight because of the small sample size of 44 customers and bias inherent in the survey." (Resp. to Mot. for Summ. J. 15 n.5.) It is a bit disingenuous for ZUP to argue both that the survey is entitled to little weight *and* that it should be given substantial weight as the sole source of evidence that direct infringement occurred.

performing a claimed process is] not a direct infringement because a method or process claim is directly infringed only when the process is performed"); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1374 (Fed. Cir. 1991) (holding method claims were not directly infringed by the mere sale of an apparatus capable of performing the claimed process).  For example, a reasonable jury could find these customers knelt on the board, using the side-by-side foot bindings as kneepads while holding onto the handles.  Alternatively, the users could have stood on the board without using the handles at all, merely gripping the side of the board for added stability.  Neither use would constitute a direct infringement of every step of Claim 9 of the '681 Patent.

However, the Federal Circuit has upheld claims of indirect infringement based only on circumstantial evidence of direct infringement by unknown parties. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("[T]he jury in the present case could have reasonably concluded that, sometime during the relevant period from 2003 to 2006, more likely than not one person somewhere in the United States had performed the claimed method using the Microsoft products.").  Of course, this broad interpretation renders toothless the Federal Circuit's previous holdings requiring plaintiffs to provide evidence of direct infringement.  But, since a jury could reasonably conclude that a hypothetical consumer using the Versa Board "more likely than not" used the product in a way that infringed Claim 9 of the '681 Patent, the Court will proceed in its analysis.

Beyond providing evidence of direct infringement, the patent holder must also show that the alleged contributory infringer was both aware of the patent and that its

actions would lead to the infringement. *Commil USA, LLC v. Cisco Systems, Inc.*, 135 S.

Ct. 1920, 1926 (2015) (citing *Afro Mfg. Co. v. Convertible Top Replacement Co.*, 377

U.S. 476 (1964)). The parties in this case do not dispute whether Nash was aware of the

patent. It clearly was. (*See e.g.*, App. 572.) However, Nash contends that it cannot be

held liable for having knowledge that its actions would lead to an infringement of Claim

9 of the '681 Patent, in part, because the Versa Board has multiple substantial

noninfringing uses.

　　Due to the risk of patentees' attempts to extend their monopolies beyond the limits

of a specific grant, the Supreme Court has held—and the Patent Act requires—that the

allegedly infringing article or commodity must be unsuited for any commercial

noninfringing use. *See generally* 35 U.S.C. § 271(c); *Dawson Chem. Co. v. Rohm and

Haas Co.*, 448 U.S. 176 (1980). In other words, the allegedly infringing article must

"have no substantial noninfringing uses, and be known (by the party) 'to be especially

made or especially adapted for use in an infringement of such patent.'" *i4i Ltd.

Partnership v. Microsoft Corp.*, 598 F.3d 831, 851–52 (Fed. Cir. 2010) (quoting 35

U.S.C. § 271(c)).

　　"[A] substantial non-infringing use is any use that is 'not unusual, far-fetched,

illusory, impractical, occasional, aberrant, or experimental." *In re Bill of Landing

Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012).

(quoting *Vita-Mix Corp. v. Basic Holdings, Inc.*, 581 F.3d 1317, 1327–29 (Fed. Cir.

2009)). When reaching a determination regarding whether a use is "substantial[ly] non-

infringing," the Federal Circuit has instructed that trial courts must "consider not only the

use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market." *i4i Ltd. Partnership*, 598 F.3d at 851. In sum, "the inquiry focuses on whether the accused product[] can be used for purposes *other than* infringement." *In re Bill of Landing Transmission & Processing Sys. Patent Litig.*, 681 F.3d at 1338.

ZUP relies solely on the Federal Circuit's decision in *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325(Fed. Cir. 2008), to support its assertion that "[t]he Versa board is especially adapted to infringe Claim 9 of the '681 patent." (Resp. to Mot. for Summ. J. 26.) In *Ricoh*, the court reversed summary judgment for the defendant where it sold a product containing an infringing microcontroller embedded within a larger product that contained noninfringing components. *Ricoh*, 550 F.3d at 1337. The *Ricoh* court held that "it is entirely appropriate to presume that one who sells a product containing *a component that has no substantial noninfringing use* in that product does so with the intent that the component will be used to infringe." *Id.* at 1338.

ZUP argues that, like the infringing microcontroller in *Ricoh*, the Versa Board's "side-by-side handles . . . and side-by-side foot bindings" can "*only* be used to infringe claim 9 of the '681 patent." (Resp. to Mot. for Summ. J. 26 (emphasis added).) At oral argument, ZUP appeared to contend that even if the Court found that the Versa Board had a single substantially noninfringing use, such a determination would not be fatal to its claims for contributory infringement. This argument contravenes clearly settled and applicable law, and ZUP's assertion that the components of the Versa Board can only be used to infringe defies both sound logic and common sense.

Both the Supreme Court and the Federal Circuit have repeatedly held, without

qualification, that a claim for contributory infringement can only stand if the infringing product has *no* substantial non-infringing use. *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 443–47 (1984); *In re Bill of Lading*, 681 F.3d at 1337; *Cross Med. Prods, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005). As such, it is clear that a finding of a single noninfringing use delivers a fatal blow to a claim of contributory infringement. And in this case, the Court finds that the Versa Board has several.

The Versa Board's side-by-side handles and side-by-side foot bindings can be used in a number of substantially noninfringing ways, and a reasonable jury could not find otherwise. "The foot bindings may be placed side-by-side to ski, but also may be placed in different positions to wakeboard, or be completely removed to wakesurf." (Reb. Br. 15–16.) "The handles may be used for kneeboarding, and may be removed when wakeboarding, waterskiing, or wakesurfing." (*Id.* at 16.) To argue that these components are designed "solely to infringe" ignores the multi-functional use of the Versa Board.

After reviewing the record, the Court concludes that this case is much more similar to the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), than it is to the Federal Circuit's decision in *Ricoh*.

In *Sony*, the Supreme Court held that VCR manufacturers were not liable for contributory copyright infringement when"[t]he accused VCR could be used in two ways: to infringe a copyright by building a 'library' of broadcast movies, or in a substantial, noninfringing way to 'time-shift' a program for later viewing or to record an

uncopyrighted program." *Ricoh*, 550 F.3d at 1339 (citing *Sony*, 464 U.S. at 443–446). As the Federal Circuit noted when discussing *Sony*, "[w]here the [accused] product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie." *In re Bill of Lading*, 681 F.3d at 1338. And "[t]he fact that a product may be unavailable for simultaneous non-infringing uses while being used to infringe, is not determinative." *Id.*

Applying the analysis from *Sony* to this case, the Court concludes that the components of the Versa Board can be used in multiple ways that, at most, are "equally capable and interchangeably capable of both infringing and substantial non-infringing uses." *Id.* (discussing *Sony*, 464 U.S. 417). Unlike the infringing microcontroller embedded with noninfringing devices in *Ricoh*, the Court finds that the components of the Versa Board, by themselves, do not directly infringe the '681 Patent. As such, this claim is entirely unmeritorious.

Consequently, even if the '681 Patent was valid, the Court would still grant Nash's Motion for Summary Judgment as it pertains to Count I of ZUP's Complaint.

## ii. Nash did not induce the infringement of the '681 Patent

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Like contributory infringement, "inducement liability may arise 'if, [and] only if, [there is] . . . direct infringement.'" *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2117 (2014) (quoting *Afro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961)). As stated above, though ZUP has provided no evidence of direct infringement of Claim 9 of the '681 Patent, the

Court will proceed in its analysis under the Federal Circuit's relaxed standards allowing circumstantial evidence to suffice. *See Lucent Techs., Inc.*, 580 F.3d at 1318.

The Supreme Court has held that liability for induced infringement "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." (citations omitted)). The knowledge requirement may be satisfied by either a showing of actual knowledge or willful blindness. *Global-Tech Appliances, Inc.*, 563 U.S. at 766–71.

Beyond the knowledge requirement, "the inducement must involve the taking of affirmative steps to bring about the desired result." *Id.* at 760. In other words, the "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). The Federal Circuit has also found that "[e]specially where a product has substantial non-infringing uses"—of which the Versa Board has several—"intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Id.* at 1365.

In this case, ZUP has offered no evidence that Nash took affirmative steps to induce its customers to infringe Claim 9 of the '681 Patent. To the contrary, the evidence clearly and unequivocally supports the opposite conclusion, and no reasonable jury could

find otherwise.

The entirety of Nash's promotional materials encourages customers to use the Versa Board in a noninfringing manner. (*See* App. 266, 379–380, 387–88, 428–42.) None of the images included in these marketing materials shows users operating the Versa Board in a way that would constitute infringement. (*See id.* at 428–42.) Moreover, the instructions that accompany the product—including a printed warning decal on the board, a warning label in the instructional manual, and a warning molded into the board itself on either side of where the handles could be placed—direct users to remove the handles before attempting to stand up on the board, which would prevent infringement of the method claim. (Mem. in Supp. of Mot. for Summ. J. 33–34; *see also* App. 387–88.) Rather than taking affirmative steps to encourage its customers to use the board in an infringing manner, Nash has done the opposite.

ZUP argues that the wide variety of marketing materials and instructions accompanying the Versa Board are somehow "illusory" because the customer must engage in the "cumbersome" process of "return[ing] to the boat and unscrew[ing] the handles" before standing up on the board. (Resp. to Mot. for Summ. J. 27.) In support of this assertion, ZUP cites only to a YouTube video—which it produced—where it takes a Versa Board user no more than fifty-five (55) seconds to remove the handles. To argue that unscrewing four screws in fifty-five (55) seconds is somehow "cumbersome" or time consuming shows how desperate ZUP is to make this claim stick. Moreover, given the versatility of the Versa Board and the multiple noninfringing uses of the product's component parts, the Court sees no reason to infer intent where there clearly is none. *See*

*Warner-Lambert Co.*, 316 F.3d at 1365.

Therefore, assuming *arguendo* that Claim 9 of the '681 Patent was valid, the Court would still grant Nash's Motion for Summary Judgment as to Count II of ZUP's Complaint because ZUP has provided no evidence that Nash intended to or took active steps towards inducing its customers to infringe the method claim.

## C. ZUP Has Provided No Evidence That Nash Misappropriated Its Trade Secrets

In Count III of its Complaint, ZUP asserts that Nash violated the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336, *et seq.*, by using information that Nash obtained from ZUP in the creation of its Versa Board. (Compl. ¶¶ 50–54.) ZUP alleges that it provided Nash with "confidential information, including 3d AutoCAD design drawings of the ZUP Board and ZUP's confidential supplier-pricing information for the ZUP Board's components," which qualify as "trade secrets" [11] under the VUTSA. Va. Code §59.1-336.

In its Response to the present motion, ZUP attempts to change the scope of Count III by summarily alleging that there is "no doubt" that Nash used both ZUP's cost information and the advice that ZUP shared from its patent attorney regarding patent's validity—a claim not previously raised in the Complaint—"in its determined effort to bring the Versa board to market." (Resp. to Mot. for Summ. J. 28.) Regardless of which

---

[11] "Trade secret means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) Derives independent economic value, actual or potential, form not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code §59.1-336.

alleged trade secrets ZUP contends that Nash has misappropriated, ZUP has provided no evidence to support its assertion.

Under the VUTSA, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant misappropriated its trade secrets. *MicroStrategy Inc. v. Li*, 268 Va. 249, 255 (2004). ZUP has failed to satisfy that burden in this case. It has provided nothing more than pure speculation and conclusory statements that there is "no doubt" that Nash used ZUP's trade secrets in creating its Versa Board.[12] (Resp. to Mot. for Summ. J. 28.) Absent more, this statement alone is clearly deficient.

Tellingly, ZUP did not contest Nash's assertions concerning Count III at oral argument. Based on its failure to provide a scintilla of evidence or argument that Nash misappropriated trade secrets, the Court can only conclude that ZUP has conceded this claim.

Therefore, the Court will grant Nash's Motion for Summary Judgment as it pertains to Count III of Plaintiff's Complaint.

## D. ZUP Has Provided No Evidence That Nash Breached the Confidentiality Agreement

Count IV of ZUP's Complaint alleges that Nash breached the confidentiality agreement entered between the two parties on February 5, 2015, by using the confidential

---

[12] Moreover, there is substantial evidence that Nash would have had no need to misappropriate ZUP's trade secrets. Nash has been in the water recreational device industry for over fifty years (Mem. in Supp. of Mot. for Summ. J. 2), presumably has extensive knowledge of the manufacturing costs within the industry, and has its own patent attorney. (Rebuttal Br. 20.) Therefore, the Court finds no compelling justification to infer misappropriation in this case based on the paucity of evidence provided.

information[13] that it received from ZUP in bringing the Versa Board to market. ZUP alleges that it provided Nash "with confidential and proprietary information, including, but not limited to, information regarding: (a) ZUP's vendors; (b) component costs and materials; (c) patent information; (d) marketing plans and strategies; (e) retailer arrangements and contacts; (f) new design concepts and materials; (g) ZUP's intellectual property development and enforcement strategies; and (h) ZUP's proprietary roto-molded 3D computer designed model." (Compl. ¶ 57.)

In similar fashion to its allegation in Count III, ZUP has provided no evidence that Nash used any of ZUP's confidential information in manufacturing and selling its Versa Board. Rather, ZUP summarily concludes that there is "no doubt" that Nash used this information. (Resp. to Mot. for Summ. J. 28.)

Like its approach to Count III, ZUP also failed to contest Nash's assertions concerning Count IV at oral argument. With no evidence or argument presented to the contrary, the Court will not infer a violation of the Confidentiality Agreement based on ZUP's speculation.

Therefore, in view of the dearth of evidence that Nash has in any way breached its contract with ZUP, the Court will grant Nash's Motion for Summary Judgment as to Count IV of the Complaint.

## IV.    CONCLUSION

For the preceding reasons the Court finds that Claims 1 and 9 of the '681 Patent

---

[13] The confidentiality agreement provides that "'Confidential Information' does not include information that . . . is or becomes generally available to the public . . . or was independently developed by Nash Manufacturing, Inc. as a result of work carried out by Nash Manufacturing, Inc. without reference to the Confidential Information." (Mem. in Supp. of Mot. for Summ. J. 39.)

are invalid due to obviousness.  Assuming *arguendo* that the patent was valid, the Court would have concluded that Nash did not infringe upon the '681 Patent, either contributorily or by inducement.  Further, because ZUP has failed to produce a scintilla of evidence to the contrary, the Court determines that Nash has not misappropriated trade secrets or breached the confidentiality agreement entered into between the two parties.

Therefore, Defendant's Motion for Summary Judgment (ECF No. 35) will be GRANTED as to Defendant's Counterclaim II—rendering Counts I and II of Plaintiff's Complaint and Defendant's Counterclaim I MOOT—and as to Counts III and IV of Plaintiff's Complaint.  This case will be DISMISSED WITH PREJUDICE.

An appropriate Order will accompany this Memorandum Opinion.

The Clerk is DIRECTED to send a copy of this Memorandum Opinion to all counsel of record.

 

/s/ _____

Henry E. Hudson
United States District Judge

Date: Jan. 13, 2017
Richmond, Virginia

47